No. 4692.

JAMES REID VS. LOUISIANA STATE LOTTERY COMPANY.

The oral or written declarations of an alleged co-conspirator will not be admitted in evidence, until the conspiracy itself has been proved. Nor are such declarations to be received against another alleged co-conspirator, after the object of the conspiracy has been achieved.

APPEAL from the Superior District Court, parish of Orleans. *Hawkins*, J.   Trial by jury.

*Race, Foster & E. T. Merrick*, and *Finney & Miller*, for plaintiff and appellants.

*Joseph P. Hornor, R. S. Dennee, A. A. Atocha*, and *Semmes & Mott*, for defendant.

ON MOTION TO DISMISS.

The opinion of the court was delivered by

LUDELING, C. J.   The motion to dismiss this appeal is based on a defect in the certificate of the clerk—the want of his signature.   The omission appears to have been supplied since the filing of the motion, and the appellant has asked for an order to compel the clerk to sign the certificate *nunc pro tunc*, if it be considered that the clerk improperly signed the certificate without the permission of the court.   This order could be applied for and could be granted at any time before trial, and, as the certificate is now signed by the clerk, to grant the order would be doing a vain thing.   It is ordered that the motion be refused.

————

ON THE MERITS.

The plaintiff sues the defendant for thirteen thousand dollars upon a lottery ticket which he alleged drew a prize of that amount.   He alleges he purchased the ticket on the eighth of February, 1872, in Bayou Sara, and that the lottery was drawn on the same day in New Orleans.

The defense is that the policy ticket sued upon was fraudulently made out and entered upon the "Register" or "Book of Plays," after the lottery had been drawn, by the employee of the defendant, who combined and conspired with the plaintiff and others to defraud defendant.

The case was tried by a jury, who rendered a verdict in favor of the defendant.   The plaintiff appealed.

Several bills of exceptions were taken, but the defendant having waived in this court all objections to the evidence, it will be necessary to consider only one of the bills of exceptions.   It is the bill of exceptions taken to the reception of the testimony of Guthreaux in regard to declarations of Innerarity, the employee of defendant, and letters of said Innerarity to said Guthreaux in relation to the alleged conspiracy. The let-

ters are dated December 13, 1871; January 1, 1872; February 1, 1872; February 11, 1872 ; June 8, 1872 ;. and July 2, 1872.

Innerarity's testimony had been taken for the plaintiff twelfth of June, 1872 ; and for the defendant October 12, 1872. Most of these letters had been sent by mail and had been received by Guthreaux shortly after their dates respectively. The objections urged against this evidence were that "the declarations and letters of said Innerarity, to which the plaintiff was no party, can not make evidence against the plaintiff; and that said Innerarity had not been interrogated on this subject, and, if admissible at all, it should have been shown by him and not by this witness, as this made it hearsay testimony."

The objections were properly overruled. The evidence was admissible on the ground that the acts and declarations of one conspirator are·admissible against his accomplices, or as part of the *res gestæ*. Mr. Greenleaf says: "There are other declarations which are admitted as original evidence, being distinguished from hearsay by their connection with the principal fact under investigation. The affairs of men consist of a complication of circumstances so intimately interwoven as to be hardly separable from each other. Each owes its birth to some preceding circumstance, and in its turn becomes the prolific parent of others ; and each during its existence has its inseparable attributes and its kindred facts materially affecting its character and essential to be known in order to a right understanding of its nature. These surrounding circumstances, termed the *res gestæ*, may always be shown to the jury along with the principal fact, and their admissibility is determined by the judge, according to the degree of their relation to that fact, and in the exercise of his sound discretion." Sections 108 to 111. Again he says : "The term *acts* includes written correspondence, and other papers relative to the main design." Page 123.

There is no other question of law involved in this case.

It is not our province to disturb the judgment of the district judge or the verdict of a jury with regard to questions of fact, except such judgment or verdict be manifestly erroneous. After a careful examination of all the evidence in the record, we can not say that the verdict and judgment are manifestly erroneous.

It is therefore ordered that the judgment of the lower court be affirmed with costs.

WYLY, J.   I dissent, and will file my reasons hereafter.

---

ON REHEARING.

The opinion of the court was delivered by

MANNING, C. J.   This suit is for the recovery of thirteen thousand six hundred dollars, a prize drawn by plaintiff in the lottery company on

the eighth of February, 1872. In the previous December, John J. Inne-rarity had opened a branch office of the company at Bayou Sara for the purpose of vending lottery tickets, He presented, on his arrival, to Messrs. Mumford & Brother a letter of credence from Pike, Brother & Co., written, it appears, by request of C. T. Howard, the President of the company at New Orleans. This letter accredited one Hollingsworth, but Innerarity opened the office, and was treated by all parties as the person designated in the letter.

The mode prescribed for conducting this branch office was precaution-ary, and well calculated to guard against fraud or malpractices. At half-past three o'clock every day Innerarity was to close his office, having already made a certificate of his sales, which, it appears, is called the "book of plays," and which he was required to envelope with a heavy covering, seal it with wax, stamp it, and deliver it to the Mumford Brothers, or one of them, who thereupon were to deposit it in their safe, and send it to Pike, Brother & Co. at New Orleans by packet steamer. The drawing of the lottery was made at four o'clock same day here.

Shortly after midday of the eighth of February the plaintiff bought the ticket of Innerarity, who made his return the same afternoon before the required hour to Mumford, who in his turn indorsed the package in the usual way, and deposited it, sealed and stamped, in his safe, and it was forwarded to the main office in New Orleans at the regular time. The result of the drawing was usually known at Bayou Sara the next morning, and accordingly on the ninth Innerarity received the regular report from the company, showing that Reid's ticket had drawn the prize for the amount of which he now sues.

The defense is, that there was a fraudulent combination between all these parties to practice a deceit upon the lottery company, and that it was effected by substituting another book of plays to the one deposited with Mumford, which was made after the news of the drawing reached Bayou Sara. This new book of plays conformed to the actual drawing. The theory of the defendant is that Innerarity received intelligence early on the ninth of the actual drawing, made his book to contain the num-bers which had drawn the sum already mentioned, and got possession of the sealed package delivered to Mumford the preceding evening, and took out the book made then, and put this new one in its place.

It may be well to mention that this "book of plays" is nothing more than a piece of thinnest paper, upon which is inscribed in numerals and in technical terms the plays made by each player, or ticket-purchaser. We discard the use of the jargon employed to describe the operation, and have learned only enough of it to enable us to understand what was meant by the parties.

The testimony of Innerarity was taken on the twelfth of June, 1872,

Reid vs. Louisiana State Lottery Company.

before the trial of the cause, in which he details the sale of the winning ticket to the plaintiff, the registry of it, the inclosure of this latter in the sealed package, and its delivery to Mumford—in short, showing the regularity of his proceedings, and their conformity to the regulations prescribed for his guidance by the company. On this occasion the plaintiff addressed to him this question: "It is alleged in the defendant's answer that the ticket sued on was made out and so entered on the registry, after the drawing of the lottery, with the fraudulent design of defrauding the respondent, and that this was. done by himself (the witness), then acting as vendor, and in connection with and to the knowledge of the plaintiff and others who conspired with and assisted him in that fraud. What do you say in response to that charge?" His response was: "I say it is false."·

In the following October Innerarity's testimony was taken on the trial by the defendant, and he then recites with minute circumstantiality the progressive steps of the plaintiff and himself in perpetrating the fraud charged upon them, and unblushingly publishes his villainy. According to his account then given, the plaintiff obtained possession of the book of plays, which he had delivered sealed to Mumford, and returned it to the witness about five o'clock of the evening of the eighth. At seven o'clock of the morning of the ninth the steamer Katie brought to him the report of the previous evening's drawing, and he then made a new book of Reid's play, conforming to the successful numbers, and substituted that for the one first inclosed in the package, which had been broken open by him for that purpose. In other words, he sustains the defense, and confesses his previous perjury.

It is unnecessary to say that this witness is not to be believed. Nothing that he said on either occasion is entitled to any credence, except in so far as it is confirmed by other witnesses, or supported by the circumstances attending these transactions, or is in conformity with the surroundings of the parties. We have, however, his letters, contemporaneous with these events, which, unless otherwise explained or construed, would give color to the defendant's theory, and the witness's last version of this transaction.

Innerarity's correspondence with a resident of New Orleans of the tenth of February, two days following the drawing, contains the following sentences: "Many thanks for Thursday's drawing. Katie came in beautiful time, 7 a. m., best time she has made since I have been up here. Put in on Thursday's book for a, c, f, * * * A, B, 1, 2, and 6; you know, pretty good hit is it not? Will explain when I come down; am satisfied C. T. H. will want to interview me now." On the eleventh he writes informing his correspondent that the plaintiff left that morning for New Orleans, having a ticket for $13,600 in which he is interested to

the amount of one-third, less a small deduction, and adds: " I wish you would keep me posted. In case the company makes an immediate settlement, telegraph me to come down. I don't doubt but that Reid will play fair, but as our acquaintance is only of a couple months standing, and he so readily agreed to beat Charley Howard, he might possibly beat me. * * * My reasons particularly for asking you to keep an eye upon the money in case it is paid, is because a certain uneasiness on my part caused by a remark of Reid's. After I made the proposition to him he told me that Mumford made the remark, 'I have no guarantee you fellows will not go back on me,' and says he, 'I said to him, if there is any go back at all, it will be you and I that will go back on Innerarity.' * * * These are my reasons for asking you to look out for me. When two such intimate friends as Reid and Mumford doubt each other, why I want some one like yourself, etc."

These assertions would be entitled to great weight if the source from which they come were not so impure. We must read them by the light of other information, derived from the same parties, that the writer's main purpose in accepting the agency at Bayou Sara was to insure a pecuniary benefit to himself, to be obtained by practicing a fraud upon his employer. It will not escape remark that this accords in one aspect with the theory of defendant, who urges, not without plausibility, that this was the special occasion selected by the agent to practice the fraud contemplated by him. But it was impossible to perpetrate that fraud, in the manner in which it is said to have been done, without the active co-operation of Reid and the Mumfords, and we shall see further on the impossibility of such co-operation. Our theory is, that after Innerarity had ascertained the success of Reid's play, he instantly concocted a scheme to evolve benefit to himself out of it, and these letters were the first efforts of his artful ingenuity in that direction.

Much importance is attached to the time when the Katie reached Bayou Sara on the ninth. If she made her first landing there at seven o'clock a. m. of that day, there would have been ample time for Innerarity to have made the substitution of the false play. But time was not the only thing needful to enable him to accomplish that. The assistance of others was absolutely necessary.

John P. Mumford's testimony is that the sealed package containing the plays in the lottery of February 8 was handed him on the afternoon of that day by the clerk Phillips, and he deposited it in the sub-treasury of the safe, locked it, put the key in his pocket, and was absent from the town with the key until the next day, and that no one could have got the package from the safe but his brother, who had the only other key.

F. M. Mumford says that neither Reid, Innerarity, Phillips, nor any one else could have got the package out of the sub-treasury; that his

brother went in the country with one key and witness had the other, and that the package remained where his brother had put it undisturbed until it was taken out and forwarded to New Orleans, as was their custom to do every day. There was no way of getting the package out, save with one or other of the keys, or by breaking open the safe, and the safe was not broken open. Both these witnesses denounce the contrary statement of Innerarity as false.

M. P. Phillips, the clerk, says that Innerarity handed him the package of plays on the afternoon of the eighth of February, shortly before four o'clock, and that he delivered it to John P. Mumford, who put it in the sub-treasury of the safe in witness's presence, and no one thereafter could have access to it but the two Mumfords.

Reid, the plaintiff, repels the charge of his complicity in the alleged abstraction and alteration of the book of plays as false and malicious. He did not know, on the eighth or ninth that this book was ever delivered to the Mumfords. It was not until afterward that he learned that the Mumfords were the custodians of it by arrangement with the lottery company. He swears emphatically that neither Innerarity nor any other person ever made any proposition to him such as that witness has deposed in his last testimony; that there was not any collusion between him and Innerarity, and that he bought the ticket before two o'clock on the eighth, regularly, and in the same manner of previous purchases.

But this is the testimony of parties who are implicated. They are alleged to be the co-conspirators of the agent of the defendant. Resort is then had to proof of the character of these persons. Twelve witnesses, themselves above reproach, have sworn that the Mumfords and Reid are incapable of the act attributed to them; that they are men of recognized integrity and truthfulness, and that the act is so out of harmony with their daily walk and conversation that it is incredible. And if a blameless life, and erect moral attitude, preserved during the mutations of business and social life, is not a shield to protect him who bears it from the shafts of malevolence and perfidy, where shall we find one? The changes which have been made both in the law of evidence and the qualifications of witnesses, have opened the door to much testimony that in former times would have been rejected, and the character of a witness has thereby become of increased importance. Courts must scrutinize and weigh testimony as men do in the ordinary routine of life, and particularly must this court do so, since it is entrusted with the power to review all the facts and to reverse or amend the verdict of juries. And as men of sound mind and unbiased judgment would not in the most trivial matters of ordinary life believe a confessed perjurer as against three reputable men, so we can not give our judicial sanction to a defense based upon the theory that the three reputable

men are perjurers and the perjurer has alone told the truth, and told it, too, upon one occasion only, and at the very time when he avows his previous false swearing.

We are reminded that the verdict of the jury was for the defendant, and it is urged that verdicts should not lightly be disturbed. The jury were deprived of much important testimony by the ruling of the judge, presently to be noticed, and they had not before them all that we have, the excluded testimony having come up, subject to the bills taken to that ruling. But it is a part of our func ion to ascertain whether a jury has rendered a proper verdict, and if not, to render one, such as they should have done, and to give judgment accordingly. Under the common law, the jury has a special and exclusive function. It alone can determine the questions of fact. This principle is deeply imbedded in that system. But a jury is an anomaly, an excrescence, in the system of the civil law. There the prætor, the judge, decides law and fact, and the jury has been superadded here by a sort of contagion imparted by our sister States, and has been adopted so recently in continental countries, where the civil law prevails, that it can scarcely yet be said to have become acclimated there.

The jury had not before them the deposition of Innerarity wherein he pronounces the allegation of a fraudulent conspiracy between himself and the plaintiff to be false and unfoundod; wherein he details the regularity of the whole transaction, and vouches the good faith of all the parties. This testimony, which was offered to show what the same witness had formerly sworn to in the same cause, was excluded by the judge for the reason, " as the witness is in court giving his evidence orally, the former deposition is dead, null, and void, and can neither be received in evidence nor referred to for the purpose of contradicting the witness."

This ruling is remarkable, and the reason assigned for it is more remarkable than the ruling. It is proper to observe that the counsel who have presented the defendant's case to this court declined to countenance an error so patent and gross, and therefore waived our consideration of the bill.

The only bill necessary for us to consider is that taken by the plaintiff to the admission of Innerarity's letters. It will be seen that we have treated these letters as if they were properly admitted, by quoting from them, and thereby giving to defendant the benefit of all the testimony he had offered. But they were inadmissible, and for the reason that they were offered to show the assertions and statements of one of the conspirators in this scheme of spoliation, when no conspiracy had been proved. It was only charged. It should have been proved first, and a basis thus laid for their introduction. There is another reason for their

rejection quite as good. The common enterprise was at an end. The conspiracy, if any existed, had accomplished its purpose, but these letters were written subsequent to that accomplishment, and no conspirator is permitted to affect his accomplices by writings or declarations made subsequent to the accomplishment of the common design.

There is also urged in defense the non-payment by the plaintiff of the price of the ticket, which should preclude him from a judgment for the sum drawn by it, and the non-receipt by the defendant of the purchase price. The evidence is sufficiently satisfactory of the payment by the plaintiff to the agent, and if the defendant's agent did not pay to him, his recourse must be by other means than a refusal to recognize the validity of the sale.

Lastly, we have been urged to remand the case for more precise proof of the time of the Katie's landing on the ninth of February, and whether Innerarity boarded her on her first landing, and also touching the payment by Reid of the price of the ticket, and the defendant's receipt of that price. We have already said that the time of the steamer's landing, even if proved to be seven o'clock, as stated by Innerarity, would not render more probable the commission of the fraud by the plaintiff and the Mumfords. It would show a better opportunity for Innerarity to perfect the scheme and put it in practical operation. But the consent and co-operation of these other parties would still be wanting.

We rest our decision broadly and squarely upon the fact that the only witness who sustains the defense is unworthy of belief, and that the parties whom he implicates deny the accusation, tell consistent stories of the transaction, do not differ from each other even in unimportant particulars, and their veracity, integrity, and honor are put beyond and above all question.

It is therefore ordered, adjudged, and decreed that the decree rendered by our predecessors and the verdict of the jury in the lower court are set aside, and the judgment of that court is avoided and reversed, and it is now ordered, adjudged, and decreed that the plaintiff have and recover of the defendant thirteen thousand six hundred dollars, with five per cent per annum interest from March 8, 1872, and three dollars costs of protest, and costs of both courts.

### DISSENTING OPINION.

MARR, J. I concur in the opinion and conclusions of the majority upon the questions of fact; and I think the obligation of the Lottery Company to pay the prize drawn in this case is as complete as it can be in any case. .

The Legislature has seen fit to incorporate the Lottery Company, and to grant it the monopoly of the lottery business and of the vending of

lottery tickets in the State; but I do not understand that this law vests in the court any new powers or imposes on them any new duties.

The Code of 1825, article 2952, declared that "the law grants no action for the payment of what has been won at gaming, or by a bet, except for games tending to promote skill in the use of arms, such as the exercise of the gun, foot, horse, and chariot racing." And it keeps this species of gaming within bounds by empowering the judge "to reject the demand when the sum appears to him excessive."

Municipal corporations were authorized to license gambling-houses, and the act of 1831, which was intended to suppress gaming-banks, expressly excepted from its provisions the gaming-houses licensed in the city of New Orleans; but, under the dominion of the Code, no action could be maintained for the recovery of money lost or won in these licensed houses.

The act of 1868, by which this Lottery Company was incorporated, does not profess to repeal article 2952 of the Civil Code; and it is reproduced and re-enacted as article 2983 in the Revised Civil Code, adopted March 14, 1870.

Both these statutes are in force; and they are not in conflict. The Lottery Company may pursue its business, and the law protects it in the enjoyment of its exclusive right by severe penalties which effectually prevent competition. Those who choose may buy tickets, and the Lottery Company may pay to winners the prizes drawn. But the Revised Civil Code, later in date than the Lottery Act, still declares that "the law grants no action for the payment of what has been won at gaming or by a bet;" and the courts, in my opinion, are bound to observe and to enforce this law. Those who choose may take their chances at this business. The law does not forbid it; but the law does forbid the judicial tribunals to enforce payment of what is won at "gaming or by a bet," and these terms in my opinion include the Lottery.

The record in this case vindicates fully the wisdom of the Code in refusing to grant an action in such cases; and the parties should be left to settle their disputes and controversies touching the fairness of their play, and all kindred questions, without the intervention of the courts.

In my opinion the judgment should be for the defendant, upon the single ground that the obligation to pay is one for which the law grants no action.